**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CLARENCE JORDAN, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  v.<br><br>EVERYDAY HEALTH, INC., DOUG MCCORMICK, BEN WOLIN, HABIB KAIROUZ, DAVID GOLDEN, SHARON WIENBAR, MYRTLE POTTER, DANA EVAN, and LAIZER KORNWASSER,<br><br>Defendants. | Case No. __16-8836_____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Clarence Jordan ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of themselves and the other public stockholders of Everyday Health, Inc. ("Everyday Health" or the "Company") against the Company and its Board of Directors (the "Board" or "Director Defendants") for their violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(d)(4), 78n(e), and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9") in connection with the proposed merger of Everyday Health with Ziff Davis, LLC ("Ziff Davis") pursuant to the October 21, 2016 Agreement and Plan of Merger (the "Merger Agreement"), through Ziff Davis's wholly-owned Delaware company, Project Echo Acquisition Corp. ("Purchaser"). Under the Merger Agreement's terms, Purchaser will merge with and into Everyday Health, with

Everyday Health surviving the merger as a wholly owned subsidiary of Ziff Davis (the "Proposed Transaction").

2.      Pursuant to the terms of the Merger Agreement, Everyday Health stockholders will receive $10.50 in cash, for each share of Everyday Health common stock that they own (the "Merger Consideration").  The Merger Consideration represents a 5% discount to the average 12 month price target set by Wall Street analysts covering the Company.

3.      In order to convince Everyday Health's stockholders to vote in favor of this flawed transaction, the Board authorized the filing of a materially false and/or misleading 14D-9 Recommendation Statement on November 2, 2016 (the "Recommendation Statement").  The Recommendation Statement recommends and solicits Everyday Health stockholders to vote in favor of the Proposed Transaction and exchange their shares pursuant to the terms of the Merger Agreement, based among other things on misleading and omitted information that was relied on by the Board and the opinion of Qatalyst Partners, LP that was rendered to the Board in its fairness opinion.  The Recommendation Statement is false and/or misleading due to the omission of material information concerning: (i) the September 2016 Projections; (ii) Qatalyst's calculation of the Company's weight average cost of capital ("WACC") and implied perpetuity growth rate used in its *Discounted Cash Flow Analysis*; and (iii) and the specific multiples used by Qatalyst in its *Selected Companies Analysis* and *Selected Transaction Analysis*.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Everyday Health and the Board for violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(a), 78t(a), and SEC Rules G and 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Everyday Health stockholders before the vote on the Proposed Transaction or, in the event the

Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Section 14(d)(4), 14(e) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.  17 C.F.R. §240.14a-9.

6.     This Court has personal jurisdiction over each Defendant either because the Defendant is an individual who is present in this District or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Everyday Health maintains its principal place of business in this District.

## PARTIES

8.     Plaintiff has, and continues to be, at all relevant times a stockholder of Everyday Health.

9.     Everyday Health is a Delaware Corporation that maintains its principal executive offices at 345 Hudson Street, New York, New York 10014.  The Company trades on the New York Stock Exchange under the ticker symbol "EVDY."  Everyday Health develops and operates digital marketing and communications platforms for healthcare marketers seeking to engage consumers and healthcare professionals by providing health and wellness content through websites, mobile applications, and social media.

10.    Defendant Doug McCormick ("McCormick") has served as the Chairman of the Board since March 2008 and a director since March 2003.

11.    Defendant Ben Wolin ("Wolin") has served as a director and the Company's Chief Executive Officer since he co-founded the Company in 2002.

12.    Defendant Habib Kairouz ("Kairouz") has served as a member of the Company's Board since March 2003.

13.    Defendant David Golden ("Golden") has served as a member of the Company's Board since February 2009.

14.    Defendant Sharon Wienbar ("Wienbar") has served as a member of the Company's Board since August 2007.

15.    Defendant Myrtle Potter ("Potter") has served as a director of the Company since September 2010.

16.    Defendant Dana Evan ("Evan") has served as a director of the Company since October 2009.

17.    Defendant Laizer Kornwasser ("Kornwasser") has served as a director of the Company since July 2015.

18.    Defendants McCormick, Wolin, Kairouz, Golden, Wienbar, Potter, Evan, and Kornwasser are collectively referred to as the "Board" or the "Director Defendants."  The Board and Everyday Health may collectively be referred to as "Defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public stockholders of Everyday Health (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. As of October 20, 2016 there were approximately 33,540,415 outstanding shares of Everyday Health common stock.   The actual number of public stockholders of Everyday Health will be ascertained through discovery.

22.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Recommendation Statement in violation of Sections 14(d)(4), 14(e) of the Exchange Act and SEC Rules and Regulations including Rule 14a-9; (ii) whether the Director Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their  shares regarding the Proposed Transaction based on the false and/or misleading Recommendation Statement.

23.     Plaintiff is committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, Plaintiff has the same interests as the other members of the Class, and Plaintiff does not have any interests that are adverse to the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

26.     Everyday Health develops digital marketing and communications platforms for healthcare marketers seeking to engage both consumers and healthcare professionals.  Everyday Health platforms include websites, mobile applications, and social media assets designed to provide consumers and healthcare professionals with access to health and wellness content.

27.     Ziff Davis is a wholly owned subsidiary of j2 Global, Inc. ("j2 Global"), a cloud and media services holding company.  Ziff Davis is part of j2 Global's digital media division and is a leading provider of marketing and technology services.

### B.     Events Leading to the Merger Agreement

28.     In April 2015, the Company engaged Qatalyst to provide strategic advice, which included advising the Company with respect to potential interest from potential third party acquirers and investors, but no active sale process was authorized.

29.     By April 2016, the Company had been contacted by three potential acquirers After meeting with the Board, Qatalyst communicated to those potential acquirers that the

Company would not engage in discussions or conduct due diligence until after its 2016 First Quarter financial results were released on May 5, 2016.

30.     Starting at the end of April 2016, the Company entered into non-disclosure and standstill agreements with certain interested parties, which included Ziff Davis.  The Company requested that the interested parties submit non-binding proposals by July 18, 2016.

31.     In early July 2016, the Company received an informal indication that an institutional investor was interested in a minority equity stake in Everyday Health.

32.     By July 18, 2016, the Company had received three all-cash non-binding proposals ranging from $10.00 per share to $10.50 per share.  Certain interested parties, including Ziff Davis, indicated that they were only interested in certain aspects of the Company's business.

33.     On July 19, 2016, the Board met to discuss the responses from the interested parties and resolved to continue discussions with the parties still interested.  Those discussions continued throughout July, August, and September.

34.     On July 28, 2016, the Company's management presented the Board with revised 2016 financial projections, which reflected a reduction in expectations.  After questioning management regarding the revised projections, the Board resolved to continue its search for a strategic transaction.

35.     On September 9, 2016, management provided the Board with an updated set of financial projections for the years 2016 through 2020.  Again, these updated projections reflected downward adjustments to the Company's financial expectations.  Qatalyst also presented the Board with an updated valuation of Everyday Health based on the updated projections.

36.     On October 2, 2016, Qatalyst provided the revised financial projections to the remaining bidders as well as the institutional investor.

37.     On October 3, 2016, Qatalyst informed the remaining interested parties that the Company had requested finals bids, financing letters, and comments to a draft merger agreement by October 10, 2016.

38.     On October 10, 2016, the Company received all-cash bids from the two remaining interested parties.  One party submitted an offer of $9.50 per share.  Ziff Davis offered $10.50 per share.  Additionally, the Company received a non-binding proposal to invest $15 million to $50 million in equity from an institutional investor.

39.     On October 11, 2016, the Company asked Ziff Davis to increase its offer to $10.75 per share.  Simultaneously, the Board unanimously agreed to pursue a transaction with Ziff Davis.  Qatalyst then informed Ziff Davis that the Company would enter a seven-day exclusivity period with Ziff Davis.

40.     After additional negotiations and due diligence, Ziff Davis informed the Company that its final bid stood at $10.50 on October 20, 2016.

41.     On October 21, 2016, the Board met and discussed Ziff Davis' final offer.  After Qatalyst provided the Board with an oral fairness opinion, the Board unanimously agreed to the Proposed Transaction and entered into the Merger Agreement with Ziff Davis.

**C.     The Proposed Transaction**

42.     After approving the Merger Agreement on October 21, 2016, Everyday Health issued a press release announcing the Proposed Transaction, which stated:

> Everyday Health, Inc. (NYSE: EVDY), a leading provider of digital health marketing and communications solutions, today announced that it has entered into a definitive merger agreement with Ziff Davis, LLC, a leading digital media company in the technology, gaming and lifestyle categories, which comprises the Digital Media Division of j2 Global, Inc. (NASDAQGS: JCOM). Under the terms of the agreement, Ziff Davis will acquire Everyday Health for $10.50 per share in cash, representing an approximate enterprise value of $465 million. The transaction represents a 28% premium to Everyday Health's unaffected closing share price on October 19, 2016, the trading day prior to media reports that Everyday Health was considering strategic alternatives. It also represents a

premium of approximately 57% to Everyday Health's average closing share price over the last twelve months, up to and including October 19, 2016, the trading day prior to market speculation about a potential transaction.

Ben Wolin, Co-Founder and Chief Executive Officer of Everyday Health, commented, "We are pleased to have reached this agreement with Ziff Davis, which we believe is in the best interests of Everyday Health and our shareholders and represents the culmination of a thorough review of strategic alternatives for the Company. This compelling transaction delivers significant and immediate cash value to our shareholders, and positions Everyday Health to reach its next phase of growth. We look forward to working with the Ziff Davis team to ensure a seamless transition."

**Terms of the Agreement**

Under the terms of the agreement, Ziff Davis will commence a tender offer to acquire all of the outstanding shares of Everyday Health for $10.50 per share in cash followed by a merger in which each remaining untendered share of Everyday Health common stock would be converted into the right to receive the same $10.50 cash per share consideration as in the tender offer. The Board of Directors of Everyday Health unanimously approved the transaction. The Everyday Health Board of Directors received a fairness opinion from Qatalyst Partners and recommends that Everyday Health shareholders tender their shares into the offer. With the assistance of the Company's independent financial and legal advisors, Everyday Health conducted a thorough process to review all options to maximize value for Everyday Health's shareholders.

The transaction is conditioned upon satisfaction of the minimum tender condition, which requires that shares representing more than 50 percent of Everyday Health's common shares be tendered, and is subject to regulatory approvals and other customary closing conditions.

**D.    The Proposed Transaction Does Not Provide Adequate Value to Stockholders.**

43.    As noted above, pursuant to the terms of the Merger Agreement, Everyday Health stockholders will receive only $10.50 for each share of Everyday Health that they own.  This consideration is inadequate and undervalues the Company.

44.    The Merger Consideration reflects a 5% discount from the average target price set by analysts covering the Company.  Moreover, the $10.50 deal price reflects a 33% discount from the highest analyst target price and a paltry 5% premium over the lowest target price.

**E.   The Proposed Transaction Is the Result of a Conflicted Process.**

45.   The inadequate Merger Consideration contemplated by the Proposed Transaction should come as little surprise in the light of the conflicted so-called process that led to the consummation of the Merger Agreement.

46.   First, the Merger Agreement provides that each stock option will be exchanged for the right to receive the difference between the Merger Consideration and the strike price in cash.  Further, each restricted share awarded to the Company's executives and directors, whether vested or not, will be converted into a right to receive the $10.50 merger consideration.

47.   Everyday Health's executive officers are also parties to change in control agreements with the Company through which they stand to reap significant personal benefits. For example, Wolin, the Company's CEO, will receive over $2.5 million as a result of the change of control.  When added to the amount he will receive for tendering his shares, Wolin's total compensation for this deal amounts to almost $10 million.

**F.   The Merger Agreement Contains Onerous Deal Protection Devices.**

48.   The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no successful competing offers will emerge for the Company.

49.   Despite the unfair price, the Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers.  Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Ziff Davis a $15,180,000 termination fee.

50.   Additionally, the Merger Agreement contains a no-solicitation provision that prohibits the Company from soliciting competing acquisition proposals or, subject to certain

exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.  This clause prohibits the Company and its agents from soliciting, encouraging, or facilitating certain third party acquisition proposals for the Company.

51.    Moreover, Section 5.3 of the Merger Agreement requires the Company to enforce any standstill agreements that it had entered into with potential acquirers.  This provision has the effect of a deal protection devices because, as disclosed in the Recommendation Statement, the Company and potential bidders entered into non-disclosure and standstill agreements throughout the sale process.   Under the standstill agreements, all potential bidders were subject to a provision commonly referred to as a "Don't Ask, Don't Waive" provision, where the potential acquirer "agreed not to request a waiver of the standstill, but was not prohibited from requesting a waiver as long as such request would not reasonably be likely to require Everyday Health to publicly disclose such request (the "Don't Ask, Don't Waive" provision)[.]"    See Recommendation Statement at 15.  Several, but not all, bidders were required to agree to a "Fall-away Provision" where the standstill restrictions did not automatically terminate in the event of Everyday Health's announcement of a strategic transaction (a "Fall-away Provision")."  *See id*.

52.    Although "Don't Ask, Don't Waive" provisions can prove useful in maximizing value under certain circumstances, it must be clear that the Board understands the purpose of the provision, potential bidders were informed that all bidders would be subject to the provision, and the provisions were assigned to the successful bidder in the Merger Agreement.   Here, the Recommendation Statement is replete with any information regarding whether these conditions were satisfied and at a minimum, creates an inference that the provisions were used as a deal protection device rather than a deal maximizing device.

53.    The Merger Agreement also contains an information rights and matching rights

provision that requires the Company to notify Ziff Davis Lennar of certain unsolicited competing offers, provide Ziff Davis with information regarding such offers, and negotiate in good faith with Ziff Davis regarding same.   The Merger Agreement grants Ziff Davis recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Everyday Health to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

54.     These provisions will cumulatively discourage other potential bidders from making a competing bid for the Company.   Similarly, these provisions and the voting agreement make it more difficult for the Company and individual stockholders to exercise their rights and to obtain a fair price for the Company's shares.

**G.     The Incomplete and Materially Misleading Recommendation Statement.**

55.     On November 2, 2016, Everyday Health filed a Schedule 14D-9 Recommendation Statement (the "Recommendation Statement") with the SEC.     The Recommendation Statement provides Everyday Health's stockholder with the Board's recommendation and solicitation of the Company's stockholders to tender their shares in favor of the Proposed Transaction and is signed by one or more of the Director Defendants.

56.     The Recommendation Statement misrepresents and/or omits material information that is necessary to ensure the statements in the Recommendation Statement are not false and misleading so the Company's stockholders can make an informed decision regarding whether to tender their shares in favor of the Proposed Transaction in violation of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act.   Specifically, the Recommendation Statement fails to provide the Company's stockholders with material information concerning the financial analyses and work performed by Qatalyst necessary to ensure that the statement in the Recommendation Statement

concerning Qatalyst's analyses and work are not false or misleading.  As a result of the incomplete and misleading Recommendation Statement, the Company's stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning Everyday Health's Financial Information and Bankers' Analysis**

57.     Pages 26 through 29 of the Recommendation Statement purport to contain a summary of "Certain Unaudited Prospective Financial Information."  The Recommendation Statement discloses that management developed three sets of financial projections over the course of the sale process:  (i) the Initial 2016 Projections; (ii) the July 2016 Projections; and (iii) the September 2016 Projections.  As demonstrated by the chart below each subsequent set reflected a reduction in the Company's financial projections, and the Board utilized and relied on the lowest set of projections, the September 2016 Projections, in recommending shareholders tender their shares.[1]

| Revenues | | | |
|---|---|---|---|
| | **2016E** | **2017E** | **2018E** |
| Initial 2016 Projections | $267M | $314M | $373M |
| July 2016 Projections | $260M | $312M | $371M |
| September 2016 Projections | $256M | $286M | $325M |

---

[1]     The Board did not project after 2018 in the Initial 2016 Projections and the July 2016 Projections.

| ADJUSTED EBITDA | | | |
|---|---|---|---|
| | **2016E** | **2017E** | **2018E** |
| Initial 2016 Projections | $51M | $70M | $96M |
| July 2016 Projections | $48M | $67M | $96M |
| September 2016 Projections | $45M | $53M | $67M |

58.    The Recommendation Statement states on pages 17, 19, 21, and 27 that the reduction in the September 2016 Projections was due to "prevailing industry trends and uncertainties, competitive trends and issues specific to Everyday Health." This statement is false or misleading because since early 2016, the market apparently did not perceive that to be the case since as demonstrated by the chart below, the stock price gradually rose during this period and presumably the markets would at least be partially aware of this issue.



59.    This partial disclosure renders the Recommendation Statement materially false or misleading because stockholders are unable to determine whether the drop in free cash flows was the result of an increase in taxes, payments for business acquired, or investment in working capital. Everyday Health shareholders are entitled to this information.

60.    Compounding this materially misleading information is the fact that the Company projected an increase in stock based compensation at the same time it projected a drop in free

cash flows. It even appears that Ziff Davis had concerns with this assumption as it was specifically addressed during negotiations. Without further disclosure as to why the Company made these perverse projections, the Recommendation Statement's description of Everyday Health's projections is materially misleading, and Everyday Health shareholders are entitled to an explanation regarding these assumptions. Relatedly the Company should disclose why it assumed it would incur a stock-based compensation expense of between 33% and 100% of its free cash flows. This disclosure is particularly important to ensure the existing statements are not false and misleading because Qatalyst applied a 22% dilution factor to account for stock-based compensation, meaning even the Company's own financial advisor apparently did not believe this was a reasonable assumption.

61.     The Recommendation Statement discloses that Qatalyst relied on the same false and/or misleading September 2016 Projections described above in creating certain valuations used to render its fairness opinion including the *Discounted Cash Flow Analysis,* the *Selected Companies Analysis,* and the *Selected Transactions Analysis*.

62.     In addition, further disclosure is required to ensure the Recommendation Statement's description of Qatalyst's *Discounted Cash Flow Analysis, Selected Companies Analysis* and *Selected Transactions Analysis* on pages 29 through 34 are not material false and misleading because the Recommendation Statement does not disclose: (i) Qatalyst's determination of certain key inputs used in the *Discounted Cash Flow Analysis*; and (ii) the specific multiples used in the *Selected Companies Analysis* and *Selected Transactions Analysis*, which renders the above-identified valuation analyses contained in the Recommendation Statement false and/or misleading in violation of Section 14(d)(4), 14(e) and Rule 14a-9 of the Exchange Act.

63.     Qatalyst performed a *Discounted Cash Flow Analysis* ("DCF Analysis") for

Everyday Health in support of its fairness opinion.  To run the DCF analysis, Qatalyst calculated the estimated present value of the standalone unlevered, after-tax free cash flows that Everyday Health forecasted to generate during the calendar year ending December 21, 2016 through the calendar year ending December 21, 2021 based on the September 2016 Projections.  The DCF Analysis is materially false or misleading because it fails to disclose:  (i) how Qatalyst calculated the Company's WACC, which purportedly supports the discount range used; and (ii) why Qatalyst assumed a positive perpetuity period multiple despite the September 2016 Projections showing a reduction in free cash flows through 2021.  Without this information, the Recommendation Statement is materially false or misleading.  Everyday Health shareholders are entitled to this information in order to determine whether Qatalyst's DCF Analysis is reliable.

64.     With respect to Qatalyst's *Comparable Companies Analysis* and *Comparable Relative Contribution Analysis*, the Recommendation Statement fails to disclose the individually observed contributions of each of the financial metrics utilized – equity values, estimated EBITDA (which was adjusted for capital structures), and adjusted cash flow from operations (which was adjusted to exclude equity allowances for funds used for construction).  Nor does it provide the low to high range of the multiples.  The omission of this information renders the Recommendation Statement materially false or misleading because without this information, Everyday Health shareholders are unable to determine whether the multiples range used by Qatalyst was reasonable.  Moreover, the Recommendation Statement discloses that Qatalyst's *Selected Companies Analysis* and *Selected Transactions Analysis* relied on "Everyday Health's estimated last-twelve-months Adjusted EBITDA Excluding Capitalized Expenses based on Analyst Projections."  These projections were **<u>not</u>** provided to potential purchases and treat capital expenditures as an expense, which should greatly reduce the value resulting from those analyses.  This is because Adjusted EBITDA Excluding CAPEX was $28M in 2017 compared to

$45M (**61% higher**) if it was not excluded.  The Company should explain the rationale for using this much lower multiple, which was not utilized in any of the other valuation analyses so its summary of Qatalyst's financial analysis is not materially false and misleading to stockholders.

65.     The Recommendation Statement is false or misleading due to the omissions identified above in paragraphs 55 through 64.   Company stockholders cannot evaluate for themselves whether the financial analyses performed by Qatalyst were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, stockholders require this information in order to fully evaluate the extent to which Qatalyst's opinions and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

## COUNT I

### Claim for Violations of Section 14(e) of the Exchange Act
### Against All Defendants

66.     Plaintiff repeats and realleges each allegation set forth herein.

67.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . ."  15 U.S.C. § 78n(e).

68.     As discussed above, Defendants filed and delivered the Recommendation Statement to Everyday Health shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

69.     During the relevant time period, Defendants disseminated the false and misleading Recommendation Statement above.  Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70.    The Recommendation Statement was prepared, reviewed and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information identified above.

71.    In so doing, Defendants made misleading statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

72.    The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

73.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

74.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

75. Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

76. Defendants have issued the Recommendation Statement with the intention of soliciting shareholder support for the Proposed Transaction.

77. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

78. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

79. In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

80. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

81.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

82.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT III

### Claims for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

83.     Plaintiff repeats and realleges each allegation set forth herein.

84.     The Individual Defendants acted as controlling persons of Everyday Health within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Everyday Health, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

85.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

87.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

C.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

November 14, 2016                          Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: */s/ James Wilson*
Nadeem Faruqi
James Wilson
685 Third Avenue, 26th Fl.
New York, NY 10017
Phone: (212) 983-9330
Fax:    (212) 983-9331
Email:  nfaruqi@faruqilaw.com
         jwilson@faruqilaw.com

*Attorneys for Plaintiff*